## JEROME v. TWENTIETH CENTURY FOX–FILM CORPORATION.

District Court, S. D. New York.
July 24, 1946.

See also 62 F.Supp. 300.

O'Brien, Driscoll & Rafferty, of New York City (Arthur F. Driscoll, Milton M. Rosenbloom and Everett Birch, all of New York City, of counsel), for plaintiff.

Edwin P. Kilroe, of New York City (Edwin P. Kilroe and Julian T. Abeles, both of New York City, of counsel), for defendant.

Sidney Wm. Wattenberg, of New York City, for Music Publishers Protective Ass'n, Inc., amicus curiae.

John Schulman and William Klein, II, both of New York City, for Songwriters Protective Ass'n, amicus curiae.

Leo J. Rosett and Alfred Beekman, both of New York City, for Shapiro, Bernstein & Co., Inc., amicus curiae.

LEIBELL, District Judge.

To sustain plaintiff's two causes of action, the first for infringement of copyright and the second for unfair competition, this Court would have to find either (a) that the defendant never acquired any right to use plaintiff's musical composition "Sweet Rosie O'Grady" in defendant's motion picture of the same name, or (b) that, if defendant did acquire a right to use the song and title, the Court should declare those rights forfeited by reason of defendant's failure to pay the $5,000 fee it had contracted to pay plaintiff for the use of the song. I have concluded that defendant did acquire from plaintiff the right to use plaintiff's musical composition in defendant's motion picture of the same name, and to use it as the title of the picture, and that defendant's refusal to pay was not arbitrary

or "the exercise of a deliberate choice unjustified on the known facts," but on the contrary was properly based on plaintiff's inability to deliver a license that would cover "world rights" and on plaintiff's failure to clear the claims asserted by Feldman of London and Albert of Australia, and, for a time the claim asserted by Edward Marks Music Company of New York.

■ The facts in this case which have been hereinabove set forth in some detail show that plaintiff through her agents, Mills Music, Inc. and through their Agent and Trustee, Harry Fox, agreed to sell greater rights than she possessed, that is the "world rights" to the musical composition, "Sweet Rosie O'Grady." One of her agents, Irving Mills, even agreed that they were "to clear all rights." Not only did plaintiff and her agents know that the defendant was going ahead with the recording in February, 1943, but plaintiff's agents specifically "authorized the use" of the musical composition January 27, 1943, and defendant so used it beginning February 22nd and completing it July 12th, 1943. Indeed, plaintiff was asking for proper screen recognition in June and July 1943 (Exs. 13, O and P). Defendant must have spent hundreds of thousands of dollars in the production of the picture. It grossed $2,800,000 in exhibitions throughout the country. Defendant never repudiated its agreement, as Exhibit 11 clearly shows, but defendant did try to hold plaintiff to the agreement made by her agents to deliver "world rights" and to clear up certain asserted claims. What plaintiff is really seeking in this suit is to have the court declare a forfeiture of the rights defendant acquired through its negotiations with plaintiff's agents. Plaintiff brings this suit in equity. She seeks equitable relief and a great sum in money damages (over a million dollars). Equity does not look with favor on forfeitures and will not enforce a forfeiture unless the "failure to pay was but the exercise of a deliberate choice unjustified on the known facts." Hal Roach Studios, Inc., v. Film Classics, Inc., 2 Cir., 156 F.2d 596, 599.

■ The defendant and its attorneys have throughout their dealings with the plaintiff and her agents and attorneys only sought to hold plaintiff to her agreement. The attorneys for the defendant have themselves cleared up plaintiff's title through their own efforts and through the payment of substantial sums ($500 to Marks; $500 to Albert; $1500 to Sould Film Music Bureau, Ltd. for Feldman's European interest). That the amounts thus paid were reasonable is not challenged. The defendant is not an infringer. There is no merit to plaintiff's two causes of action pleaded in the amended and supplemental complaint.

Although the above really disposes of this suit, I feel that I should express my views on certain defenses pleaded by the defendant. Defendant attacks the validity of plaintiff's original copyright of 1896 on the ground that it was not completed by the filing of two copies of the musical composition at the time of publication. (Findings Nos. 10 to 13 incl.) Section 4956 of the Revised Statutes contained the provisions which set forth the requirements for obtaining a lawful copyright in the year 1896. It was amended by Section 3 of the Act of March 3, 1891, c. 565, 26 Stat. 1107, 17 U.S.C.A. § 12 note. At that time it provided that no one would be entitled to a copyright "unless he shall, on or before the day of publication in this or any foreign country, deliver at the office of the Librarian of Congress, or deposit in the mail * * * a printed copy of the title of the * * * musical composition * * * for which he desires a copyright, nor unless he shall also, not later than the day of publication thereof in this or any foreign country, deliver at the office of the Librarian of Congress * * * two copies of such copyright * * * musical composition * * *."

Compliance with the provisions of this statute was a condition precedent to obtaining a lawful copyright, and while there is some slight conflict as to the effect of depositing the copies of the composition after publication the weight of authority holds to the view that unless the copies were deposited on or before the day of publication no valid copyright was obtained and an action could not be maintained for infringement. Callaghan v. Myers, 128

U.S. 617, 9 S.Ct. 177, 32 L.Ed. 547; Gottsberger v. Aldine Book Pub. Co., C.C., 33 F. 381; Osgood v. A. S. Aloe Instrument Company, C.C., 83 F. 470. See Dwight v. Appleton, Fed.Cas.No. 4215.

■■ "To constitute 'publication' there must be such a dissemination of the work of art itself to the public as to justify the belief that it took place with the intent of rendering such work common property." Slater, Law of Copyright and Trademark, as quoted in Berry v. Hoffman, 125 Pa. Super. 261, 189 A. 516. That means a general publication, such as will divest a person of his common law copyright and prevent him from obtaining a copyright under the provisions of the Act of 1891. The offer to the public by sale or distribution must be a general one and not a limited one. The essence of publication is that the matter must be available to all comers and not only to a class. Macgillivray, Law of Copyright (1902) 37. Where there is an advance distribution to the trade or for review, there is not such a distribution or dissemination as constitutes a publication. Bowker, Copyright, Its History and Law, 127. "The distribution of printed copies of a musical composition to a limited number of professional artists to render in public, is a limited, and not a general distribution." Amdur, Copyright Law and Practice (1936), 358. In Werckmeister v. American Lithographic Co., 2 Cir., 134 F. 321, 326, 68 L.R.A. 591, the court stated the rule of limited publication as follows: "A general publication consists in such a disclosure, communication, circulation, exhibition, or distribution of the subject of copyright, tendered or given to one or more members of the general public, as implies an abandonment of the right of copyright or its dedication to the public. Prior to such publication, a person entitled to copyright may restrict the use or enjoyment of such subject to definitely selected individuals or a limited, ascertained class, or he may expressly or by implication confine the enjoyment of such subject to some occasion or definite purpose. A publication under such restrictions is a limited publication, and no rights inconsistent with or adverse to such restrictions are surrendered."

■ The performance of plaintiff's musical composition at Pastor's and the distribution of copies to professional entertainers was not such a publication as to invalidate the copyright. Before any copies were sold to the public the two copies were filed in the copyright office on September 10, 1896.

On January 4, 1946, shortly prior to the trial of this case, the defendant served notice that at the opening of the trial it would apply for permission to amend its answer herein by adding thereto two additional defenses.[1]

The following is quoted from defendant's reply brief:

"(a) Sec. 1(e)[2] provides 'That the pro-

---

[1] Sixth Defense to each cause of action

11. It is alleged in the said amended and supplemental complaint, that the defendant copied, used by recording in the motion picture 'Sweet Rosie O'Grady', the musical number 'Sweet Rosie O'Grady', 'in its entirety and as background and otherwise', and the basis of the alleged infringement was in the use, and upon the parts of instruments serving to reproduce mechanically, of a musical work published and copyrighted prior to July 1, 1909, and the plaintiff's alleged copyright does not extend to such right of use.

Seventh Defense to each cause of action

12. Upon information and belief, the alleged copyright proprietor of the song, for the alleged infringement of which this action is brought, has used or licensed others to use said song in the manufacture of parts of instruments serving to reproduce the same mechanically, by recording the said musical number in a motion picture. Defendant alleges, upon information and belief, that the plaintiff and her predecessor in title failed to file notice thereof, accompanied by a recording fee, in the Copyright Office, as required by the Copyright Act of 1909, 17 U.S.C.A. § 1 et seq., by reason of which the plaintiff is prevented from asserting such alleged claim of infringement and any person, firm or corporation, including the defendant, is free to record and mechanically reproduce said song.

[2] 1(e) "To perform the copyrighted work publicly for profit if it be a musical composition and for the purpose of

visions of this Act, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical work, shall include only compositions published and copyrighted after July 1, 1909,'—

"As plaintiff's song was published and copyrighted prior to July 1, 1909, the copyright does not include the mechanical reproduction rights.

"(b) Section 1(e) further provides 'That it shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright.'

"The evidence established that plaintiff previously licensed others to mechanically reproduce the song in motion pictures. The failure to file such notice is a complete defense to this suit."

By the term "the evidence" defendant probably means Exhibits CC, DD, EE and FF referring to the license under which Columbia used plaintiff's song in a motion picture in 1926, and Exhibit LL by which this defendant was licensed to use plaintiff's song in a motion picture in 1937; and Exhibit NN, a certificate of the Copyright Office that no "notice of use" had been filed by plaintiff or her agent under § 1(e) of the Act. From this defendant's attorney concludes that plaintiff has no right of action.

This point was considered so novel and important that the music publishers and songwriters were permitted, through counsel for their associations, to file a brief amicus curiae. The issue is succinctly stated in an opening paragraph of their brief which I quote as follows:

"The question presented involves the proviso, known as the 'compulsory license,' which constitutes an exception to the general terms of Section 1(e) of the Copyright Act of 1909. The issue is raised whether this exception, which was intended to cover a specific type of mechanical musical

---

public performance for profit; and for the purposes set forth in subsection (a) hereof, to make any arrangement or setting of it or of the melody of it in any system of notation or any form of record in which the thought of an author may be recorded and from which it may be read or reproduced: Provided, That the provisions of this title, so far as they secure copyright controlling the parts of instruments serving to reproduce mechanically the musical works, shall include only compositions published and copyrighted after July 1, 1909, and shall not include the works of a foreign author or composer unless the foreign state or nation of which such author or composer is a citizen or subject grants, either by treaty, convention, agreement, or law, to citizens of the United States similar rights. And as a condition of extending the copyright control to such mechanical reproductions, that whenever the owner of a musical copyright has used or permitted or knowingly acquiesced in the use of the copyrighted work upon the parts of instruments serving to reproduce mechanically the musical work, any other person may make similar use of the copyrighted work upon the payment to the copyright proprietor of a royalty of 2 cents on each such part manufactured, to be paid by the manufacturer thereof; and the copyright proprietor may require, and if so the manufacturer shall furnish, a report under oath on the 20th day of each month on the number of parts of instruments manufactured during the previous month serving to reproduce mechanically said musical work, and royalties shall be due on the parts manufactured during any month upon the 20th of the next succeeding month. The payment of the royalty provided for by this section shall free the articles or devices for which such royalty has been paid from further contribution to the copyright except in case of public performance for profit. It shall be the duty of the copyright owner, if he uses the musical composition himself for the manufacture of parts of instruments serving to reproduce mechanically the musical work, or licenses others to do so, to file notice thereof, accompanied by a recording fee, in the copyright office, and any failure to file such notice shall be a complete defense to any suit, action, or proceeding for any infringement of such copyright."

device (phonographs, graphophones and player pianos), may be extended or indeed rewritten so as to include the use of copyrighted musical compositions in the making of motion pictures."

■ I believe that § 1(e) of the Act must be read in conjunction with § 25(e).[3] When those two sections went into effect as part of the March 4, 1909 revision of the Copyright Act, sound on film motion pictures were unknown. "Talkies," so called, were not produced until about 1924. The report of the 1909 Copyright Bill to the House of Representatives (Report No. 2222) discusses § 1(e) and mentions the various types of mechanical reproduction such as phonographs and piano-playing instruments, "purely mechanical" means. Counsel assert that no more than 500 positive prints of a film of a musical motion picture are made to supply the demands for exhibition purposes. If § 1(e) applied to a motion picture use of a musical composition, then any producer could appropriate a copyrighted musical composition for use in a motion picture for a total sum of about $10.00, at the rate of 2¢ for each positive print.

■ " 'Talkies' are but a species of the genus motion pictures." L. C. Page & Co. v. Fox Film Corporation, 2 Cir., 83 F.2d 196. The sound on film parallels and synchronizes with the pictures on the film. The sound on film is not the type of "mechanical reproduction" to which § 1(e) of

the Copyright Act applies. The real purpose of the exception in § 1(e) of the Act of 1909 was discussed in Shilkret v. Musicraft Records, 2 Cir., 131 F.2d 929, at page 931, by Swan, Circuit Judge, as follows:

"Prior to enactment of the provisions which appear in section 1(e) of the copyright statutes afforded no protection against the unauthorized mechanical reproduction of a copyrighted musical work. White-Smith Music Pub. Co. v. Appollo Co., 209 U.S. 1, 28 S.Ct. 319, 52 L.Ed. 655, 14 Ann. Cas. 628. One of the purposes of the Copyright Act of 1909, adopted shortly after that decision was announced, was to grant such protection to musical composers who copyrighted their works under the Act. * * * The real purpose of the proviso was to confine the right to compositions copyrighted after the effective date of the new Act and to leave mechanical reproducers of music copyrighted under prior statutes free to dispose of their stock of records. This appears clearly from the discussion at the Committee hearing between Chairman Currier and Mr. Burkan, who represented the Æolian Company. See Shafter, Musical Copyright, 2d Ed. pp. 330, 331."

■ Assuming that plaintiff's copyright does not include the mechanical reproduction rights because the original copyright was obtained in 1896, almost 13 years prior to July 1909, that does not support defendant's argument that the renewal of

---

3 "25(e) Royalties for use of mechanical reproduction of musical works. (e) Whenever the owner of a musical copyright has used or permitted the use of the copyrighted work upon the parts of musical instruments serving to reproduce mechanically the musical work, then in case of infringement of such copyright by the unauthorized manufacture, use, or sale of interchangeable parts, such as disks, rolls, bands, or cylinders for use in mechanical music-producing machines adapted to reproduce the copyrighted music, no criminal action shall be brought, but in a civil action an injunction may be granted upon such terms as the court may impose, and the plaintiff shall be entitled to recover in lieu of profits and damages a royalty as provided in section 1, subsection (e), of this title: Provided also, That whenever

any person, in the absence of a license agreement, intends to use a copyrighted musical composition upon the parts of instruments serving to reproduce mechanically the musical work, relying upon the compulsory license provision of this title, he shall serve notice of such intention, by registered mail, upon the copyright proprietor at his last address disclosed by the records of the copyright office, sending to the copyright office a duplicate of such notice; and in case of his failure so to do the court may, in its discretion, in addition to sums hereinabove mentioned, award the complainant a further sum, not to exceed three times the amount provided by section 1, subsection (e), by way of damages, and not as a penalty, and also a temporary injunction until the full award is paid."

742

the copyright in 1923 did not carry with it the motion picture rights. The history of the statute and the development of the means for the reproduction of sound on film, completely refute defendant's argument. The Copyright Act permits the copyright of a motion picture [§ 5(*l*) of the Act added in August 1912]; but a music roll or victrola record cannot be copyrighted. Æolian Co. v. Royal Music Roll Co., D.C., 196 F. 926. The distinction between the two was noted in Report No. 756 of the Committee of the House of Representatives and is maintained throughout the Act. It was not intended that motion picture films should be in the same class as mechanical reproductions. Since "talkies" have been produced commercially, we have had the decision in the Page case interpreting the Act as to motion picture rights. There has been no amendment of the Act to deal separately or differently with "talkies," because they are so clearly of the genus "motion pictures." The sixth and seventh defenses interposed in defendant's amended answer are without merit. To give them any recognition would be to run counter to the clear intent of Congress. The result would be destructive of valuable rights of composers and publishers, which the Act was intended to secure and protect.

Settle a decree on two days' notice in accordance with the conclusions of law hereinabove set forth.